# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 94-KA-00528-SCT

*KAY LYNN TERRY, WILLARD L. McILWAIN, JR.*
*AND TRACI RENEE EVANS, a/k/a TRACY EVANS*

*v.*

*STATE OF MISSISSIPPI*


## CONSOLIDATED WITH

## 94-KA-00546-SCT


*KAY LYNN TERRY, WILLARD L. McILWAIN, JR.*
*AND TRACI R. EVANS*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 06/01/94 |
| TRIAL JUDGE: | HON. EUGENE M. BOGEN |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | LOUIS G. BAINE, III |
| | E. TUCKER GORE |
| | PRO SE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEIRDRE McCRORY |
| DISTRICT ATTORNEY: | FRANK CARLTON |
| NATURE OF THE CASE: | CRIMINAL - MISDEMEANOR |
| DISPOSITION: | REVERSED AND RENDERED - 8/6/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 8/27/98 |


**EN BANC.**

**ROBERTS, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1. Kay Terry, Willard L. McIlwain, Jr., and Traci Renee Evans, a/k/a Tracy Evans were found guilty of contempt in the Circuit Court of Washington County. Terry and Evans were sentenced to serve 90-day terms in county jail, and McIlwain was sentenced to a term of 3 days in jail. Each defendant was ordered to pay a fine of $1,000. All three defendants have perfected an appeal to this Court. They assign as error the following issues:

## ASSIGNMENTS OF ERROR

### of Kay Terry and Willard L. McIlwain, Jr.

**I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FINDING KAY TERRY IN CONTEMPT WHEN THERE WAS NO EVIDENCE OF ANY ACT ON HER PART WHICH LED TO THE SUBJECT ARTICLE BEING PUBLISHED.**

**II. THE TRIAL COURT WAS IN ERROR IN FINDING KAY TERRY'S ATTORNEY, WILLARD L. McILWAIN, JR., IN CONTEMPT WHEN THERE WAS NO ACT ON HIS PART WHICH LED TO THE SUBJECT ARTICLE BEING PUBLISHED AND HE WAS UNDER NO OBLIGATION TO STOP THE ARTICLE BEING PRINTED BY A THIRD-PARTY OVER WHOM HE HAD NO CONTROL.**

**III. THE TRIAL COURT WAS IN ERROR IN FAILING TO ALLOW THE "RULE" TO BE INVOKED.**

**IV. THE TRIAL COURT WAS IN ERROR IN HEARING THIS MATTER ITSELF IN LIGHT OF THE FACT THAT IT SHOULD HAVE BEEN REFERRED TO ANOTHER JUDGE.**

## ASSIGNMENTS OF ERROR

### of Traci Evans

**I. THE TRIAL COURT ERRED IN HEARING THIS MATTER ITSELF, IN LIGHT OF THE FACT THAT IT WAS A CONSTRUCTIVE CRIMINAL CONTEMPT CHARGE AND HEARING, AND SHOULD HAVE BEEN REFERRED TO ANOTHER JUDGE.**

**II. THE TRIAL COURT WAS IN ERROR IN A CONSTRUCTIVE CRIMINAL CONTEMPT HEARING BY VIOLATING APPELLANT'S DUE PROCESS RIGHTS IN DENYING APPELLANT'S RIGHT TO COUNSEL.**

**III. THE TRIAL COURT COMMITTED REVERSIBLE ERROR DUE TO THE**

**STATE'S FAILURE TO SUFFICIENTLY PROVE THE ELEMENTS OF CONSTRUCTIVE CRIMINAL CONTEMPT AND THAT THE APPELLANT WAS GUILTY BEYOND A REASONABLE DOUBT.**

¶2. This Court holds that the contempt proceedings against Terry, McIlwain, and Evans should not have been heard by Judge Bogen, as he initiated the constructive contempt charges against the three. His failure to recuse is reversible error. The failure of Judge Bogen to "invoke the rule" was not reversible error because the appellants did not show how they were prejudiced by his failing to do so. Evans was erroneously charged because she did fall under the authority of URCCC 9.01. Finally, although moot, Evans was denied her right to counsel because Judge Bogen proceeded without informing her of her right to seek the advice of an attorney and the ramifications if she did not seek one. Therefore, this case is reversed and rendered.

## STATEMENT OF FACTS

¶3. This case came before the court on Petitions for Contempt Citation, some of which were brought by the State and some of which were brought by the trial court Circuit Judge Eugene M. Bogen. The contempt charges arose as a result of an article sent to the *Delta Democrat Times*, which was published on May 22, May 23, and May 24, 1994. The article was purchased by Traci Evans, a friend of Kay Terry, who had been following the criminal proceedings against Terry subsequent to her indictment for embezzlement from Friedman Iron and Metal Company. The article ran several days prior to Terry's second trial set to begin on May 25, 1994.

¶4. Terry's first trial regarding the embezzlement ended in a mistrial in January of 1994. On January 7, 1994, the Circuit Court sent out a notice that the embezzlement charge had been re-set for trial on February 17, 1994 at 9:00 a.m. Shortly thereafter, Evans wrote a letter to the editor of the paper, expressing her objection to the retrial of Terry because it was a waste of taxpayers' money. This letter was printed in the *Delta Democrat Times* on January 21, 1994.

¶5. On February 8, 1994, Evans submitted to the *Delta Democrat Times* a version of the article which is the subject of the contempt. The article contained a portion of a letter written by the Defendant's attorney to the District Attorney and a copy of a polygraph examiner's report. The article was submitted, according to Terry, without Terry's knowledge, other than Evans saying that she was going to write some letters to the editor. Evans claims that her intent was to draw attention to the proceedings that were to take place and to hopefully accumulate an audience to view the same. Evans states that she did not intend to sway anyone's mind or influence the proceedings. The ad was not published in February because of the continuance of court as a result of the February ice storm.

¶6. Evans stated that she had never met Terry's attorney, but had seen him in the courtroom in Terry's first trial. She further stated that she had never communicated with him prior to the time she took the article to the paper. She testified that the paper notified her that she would have to inform Terry that she was submitting an article. Evans said she called Terry and said, "I have submitted an article to the paper with your name in it. Do you have any objections?" To which Terry replied, "No." Evans stated she would come by later and explain to Terry what the article was about, but she did not do so. The article was a compilation of the results of the polygraph test Terry had taken and a letter from Terry's attorney written to the prosecutor in the embezzlement case. Evans stated that she took the letter without Terry's knowledge and had received a copy of the polygraph examination report from Terry.

Evans did not talk to Terry's attorney prior to her submission of the article, according to her testimony. Evans left town Friday afternoon, before the article was published on Sunday at approximately 2:00 p.m., and did not return home until 9:00 p.m. Sunday evening.

¶7. On Monday morning, May 23, 1994, Evans was contacted by Terry's attorney, Willard L. McIlwain, Jr. Evans confirmed that she was the person who placed the ad in the paper, and further confirmed that Terry did not have anything to do with the ad having been published. Later that Monday she received a letter from McIlwain requesting that she not write any more letters to the editor or publish any more articles in the paper. That letter was introduced into evidence. Evans said that the letter written to her from McIlwain did not say anything about not appearing on television, so she gave an interview to the television station. Evans said she felt that she had a right to discuss the matter regardless of any request by Terry's attorney.

¶8. On that same Monday, May 23, 1994, the Circuit Court for Washington County, Mississippi granted the State's Motion for a Continuance, and the embezzlement trial of Terry was continued without date. Judge Bogen issued a summons for Kay Terry and Willard L. McIlwain, Jr. to appear before the Circuit Court of Washington County, Mississippi at 10:00 a.m. on the 1st day of June, 1994, to show cause why they should not be held in contempt of court for violating Rules 4.01(3) and (6) of the Uniform Rules of Circuit Court Practice by causing to be published or failing to prevent the publication of the subject advertisement. Additionally, on May 25, 1994, Judge Bogen had summons issued for Traci Evans to appear before the Circuit Court of Washington County, Mississippi at 10:00 a.m. on the 1st day of June, 1994, to also show cause as to why she should not be held in contempt of Court for violating the same rules enumerated above.

¶9. On June 1, 1994, the Circuit Court of Washington County, Mississippi convened with Judge Bogen presiding. The State was represented by Frank Carlton and Gaines Dyer. Willard L. McIlwain, Jr. and Kay Terry were represented by Martin A. Kilpatrick. Traci Evans also appeared, but without counsel. After tending to preliminary matters, Judge Bogen opened the contempt proceedings with the following statement:

> THE COURT:
>
> All right, the Court, **on its own**, scheduled this hearing on contempt citations issued for Willard L. McIlwain, Jr., Kay Terry, and Traci Evans.
>
> On Sunday, May 22, 1994, and on the following two days, there appeared in the *Delta Democrat Times* an advertisement pertaining to a matter set for trial on May 25, 1994. The trial scheduled for that day was the State of Mississippi versus Kay Terry, Cause No. 23, 502, and arose from an indictment charging Ms. Terry with embezzlement from her former employer, Friedman Iron and Metal Company.
>
> I thought the advertisement was extraordinary. In 26 years at the bar and bench, I've never seen anything like it. It appeared to me to constitute a violation of the Uniform Criminal Rules of the Circuit Court practice regarding pretrial publicity and further appeared to me to constitute an attempt to influence the jury pool to be called for jury duty during the week of May 23, and I have previously granted the State's motion for a continuance of the trial. The case will be reset for a later date.

**We are here today at my direction** to fully explore the circumstances and background and facts surrounding the publication of the advertisement, the effect of which has been compounded by further coverage in the news and the appearance on television, and I'm told radio as well, by Ms. Evans and perhaps others. We'll more fully develop that today.

(emphasis added).

¶10. Also, at the beginning of the proceedings Judge Bogen asked if the parties were represented by counsel. Terry and McIlwain stated that Mr. Kilpatrick was representing them. Evans responded to Bogen's question in the negative. However, he proceeded with the case. After receiving testimony and evidence, the court then made its ruling.

¶11. During the course of the proceedings, Evans testified that she bought and paid for the ad with her own money. She stated the money used for the ad was 95% of her money, and she had gotten the rest from her friends. Evans stated that after the first trial in January, she had a conversation with Terry and said she was going to write letters to the editor, to which Terry replied that she did not care, as long as what was stated in the letters was the truth. Evans testified her purpose for placing the ad in the paper was to allow people to read over the polygraph examination, but not to sway any potential jurors because they should make up their own mind, regardless of what they read in the paper. Evans also testified that she thought her article was not polluting the jury pool. Evans stated she merely wanted to arouse public interest in the case. On cross-examination, Evans reiterated that the ad was not necessarily for the public to know Terry had passed a polygraph test, but to arouse the curiosity of people so they would attend the trial.

¶12. The first communication Terry had with her attorney concerning this matter was on Friday afternoon after her attorney had received a letter about the article from Mr. Dyer stating that Terry had placed the article. Her attorney inquired as to whether she had placed the article or had any connection with its placement, to which she responded in the negative. Terry realized that her attorney was upset and left work to go to his office. When she arrived he had gone to the newspaper. Upon his return, she went with her attorney to his library while he attempted to do some quick research on the issue to see whether or not the article could be stopped. Terry had given an affidavit stating that she had nothing to do with the ad or its being published.

¶13. McIlwain testified that he had never met Traci Evans, until he confronted her subsequent to the article's publication, nor had he ever communicated with her, in any form until after the publication of the article. McIlwain testified that he had closed his office for the week around noon on Friday so that he and his staff could go to the Cotton Club Casino to celebrate the settlement of a case. He stated that while at the casino the secretary from the Dyer Law Firm came in and handed him a letter indicating Terry had sent an article to the newspaper. McIlwain was concerned about the allegations in the letter and went back to his office around 3:00 to 3:30 p.m. This was the first time he had any knowledge that a letter or article had been sent to the newspaper, other than there having been statements that some friends of Kay's had written letters to the editor. He stated he immediately went to his office and called Kay Terry and asked her if she had sent a letter to the editor, which is what he thought at that point had been done. Terry responded that some of her friends might have sent something, but she did not know what it was about.

¶14. McIlwain testified he had never given the letter to anyone other than his client. This letter was simply copied to his client when it was written. McIlwain then went to the newspaper to talk to the editor and stated, "I have been told that my client sent a letter or article up here, and I would like to see if that is, in fact, true." He was shown the article. McIlwain testified he never authorized, encouraged, or invited in any way the dissemination of the letter to third parties.

¶15. McIlwain stated that when he went to the newspaper, he was advised there was a 5:00 p.m. deadline and if the article was not stopped by 5:00 p.m. on Friday, it would come out in the Sunday paper. An employee at the newspaper told him Terry had not sent the article, but a friend of hers had, and she thought Terry knew about it. According to his testimony, it was at this time that McIlwain first learned Traci Evans had sent the article, although he still did not know who she was. The person at the paper told McIlwain she had instructed Evans to inform Terry about the article.

¶16. McIlwain returned to his office around 4:00 p.m. in order to conduct research to determine if the paper could run the advertisement. His research indicated that the newspaper could basically print what they wanted and could contract with whomever they pleased. Their only real obligation was to tell the truth. Based on this research, McIlwain did not feel he had any authority to demand the newspaper breach a contractual obligation which they had with a third party and with whom he had no contact, and no relationship. At some point that afternoon, McIlwain went to the Dyer law firm and had a three-way conversation between himself, Gaines Dyer, and Frank Carlton. During that conversation, he was asked what he was going to do about the article.

¶17. McIlwain wrote a letter to the editor of the newspaper emphasizing that his client had nothing to do with the ad. He testified that he also attempted to call Traci Evans, the lady who sent the ad, but was unable to reach her. McIlwain stated he did not feel he was in a position or had any authority to do anything about the contract or agreement between a third party (Evans) and the newspaper. He had determined the statement in Dyer's letter, alleging that his client had placed the ad, was not true, and his brief research indicated he had no power or authority to tell the newspaper not to run the ad.

¶18. McIlwain's letter to the editor, Cazalas, went out after the 5:00 p.m. deadline on Friday. Cazalas received the letter on Monday, and another letter was hand delivered on Monday requesting that he publish no further articles. This letter was disregarded, and the paper continued to publish the ad. Cazalas testified that McIlwain could not have stopped the ad, since he was not the person who bought it.

¶19. On that Monday, McIlwain talked to Evans for the first time. It was at this point that McIlwain learned from Evans that Terry had no involvement with the article and what her true intent was. When McIlwain was asked on the witness stand if he could change things, would he have done anything differently on that Friday afternoon, he responded he would possibly have asked for a temporary restraining order, or an injunction, but he still was not sure of any legal basis for that.

¶20. Judge Bogen brought some of the criminal contempts himself alleging Terry and McIlwain either caused the article to be printed or failed to stop it. Judge Bogen was aware that Traci Evans did not have an attorney to represent her. Terry and McIlwain invoked the "rule." The court refused to allow it to be invoked because some of the witnesses were from the news media.

¶21. Evans acknowledged that she delivered and paid for the ad. The court found her guilty of three

separate acts of contempt. Evans was ordered to spend 90 days in the county jail and to pay $1,000. Terry was held in contempt because she distributed copies of the polygraph examination to some of her friends and had been told by Evans that she was sending an article to the newspaper. The court concluded that Terry must have known what was taking place. The court revoked her bond, remanding her to the custody of the Washington County sheriff and additionally ordered that she spend 90 days in jail and pay $1,000 for her participation in the publication of the advertisement.

¶22. McIlwain was found in contempt based on what it concluded were "sins of omission rather than sins of commission" and his contempt was his failure to object to or attempt to stop the publication. McIlwain was fined $1,000 and sentenced to serve 3 days in the county jail.

## DISCUSSION OF THE ISSUES

## of Kay Terry and Willard L. McIlwain, Jr.

¶23. First, it should be noted that this was a constructive criminal contempt proceeding. Conduct directed against the court's dignity and authority is criminal contempt. *Lawson v. State*, 573 So. 2d 684, 686 (Miss. 1990). It involves an act which brings the court into disrepute or disrespect. *Purvis v. Purvis*, 657 So. 2d 794, 797 (Miss. 1994) ( *citing Lawson*, 573 So.2d at 686). "Constructive contempt is an 'act calculated to impede or embarrass, obstruct, defeat, or corrupt administration of courts of justice when the act is done beyond the presence of the court.'" *Lawson*, 573 So. 2d at 686 (*quoting Coleman v. State*, 482 So. 2d 221, 222 (Miss. 1986)).

### I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FINDING KAY TERRY IN CONTEMPT WHEN THERE WAS NO EVIDENCE OF ANY ACT ON HER PART WHICH LED TO THE SUBJECT ARTICLE BEING PUBLISHED.

¶24. [T]his Court proceeds *ab initio* to determine whether the record proves the appellant guilty of contempt beyond a reasonable doubt." *Purvis*, 657 So. 2d; *citing Lamar v. State*, 607 So. 2d 129, 130 (Miss. 1992)). The burden of proof to establish that contempt has been committed is on the party that is asserting that it has. *In Interest of Holmes*, 355 So. 2d 677, 679 (Miss. 1978). In a proceeding for criminal contempt, evidence of guilt must be established beyond a reasonable doubt. *Id.*

¶25. The State must prove that Terry acted in such a manner that was calculated to impede, embarrass, obstruct, defeat or corrupt the administration of justice, when the act is done beyond the presence of the court. *Boydstun v. State*, 259 So. 2d 707, 708 (Miss. 1972). In the proceeding below there is no proof showing that Terry's actions "were calculated to have any real and substantial tendency to impede the administration of the court". *Id.* at 709.

¶26. The only thing that was proven was that Terry gave copies of a polygraph examiner's report to some of her friends and had some general knowledge that some friends were going to write letters to the editor. The Prosecutor failed to show beyond a reasonable doubt that Terry actually had anything to do with the advertisement being placed in the paper. The conclusions reached by the trial court were based on suspicion and inferences from circumstantial evidence. These conclusions did not rise to the level of "beyond a reasonable doubt." Therefore, the decision by the lower court is reversed and rendered.

**II. THE TRIAL COURT WAS IN ERROR IN FINDING KAY TERRY'S ATTORNEY, WILLARD L. McILWAIN, JR., IN CONTEMPT WHEN THERE WAS NO ACT ON HIS PART WHICH LED TO THE SUBJECT ARTICLE BEING PUBLISHED AND HE WAS UNDER NO OBLIGATION TO STOP THE ARTICLE BEING PRINTED BY A THIRD-PARTY OVER WHOM HE HAD NO CONTROL.**

¶27. The discussion above sufficiently details the burden of proof and on whom such burden is placed when proving constructive criminal contempt.

¶28. There is an implication for a requirement of *intentional* defiance of the court or a *willful* act on the part of the contemnor. ***Prestwood v. Hambrick***, 308 So. 2d 82, 84 (Miss. 1975) (emphasis added). McIlwain was not willful in allowing the advertisement to be published. Judge Bogen in the contempt proceeding called the act by McIlwain to be "sins of omission, rather than sins of commission."

¶29. However, McIlwain conducted research to see what, if anything, could be done to stop the article from running. The deadline was 5:00 p.m., and McIlwain only found out about the advertisement around 3:00-3:30 p.m. Needless to say, he was pressed for time and unable to conduct thorough and extensive research.

¶30. His research was confined mainly to a legal encyclopedia, *Corpus Juris Secundum.* There he found "authority" that stated,

> A newspaper is free to publish such matter as it regards as possessing news value. . .and may publish whatever advertisements it desires. . .while a newspaper is under the moral obligation to publish nothing that is not true. . .publishers are free to contract and deal or refuse to contract and deal regarding advertising with whom they please. . .

66 C.J.S. *Newspapers*, § 21, p. 47.

¶31. McIlwain claims on appeal that in his opinion he did not have the authority to interfere with the newspaper's contractual arrangement with a third party with whom he had no connection. The newspaper took this same position when the editor told McIlwain that only the person who bought the ad, Evans, could stop it from running.

¶32. This Court holds that McIlwain did not act in willful defiance of the court or of justice. His actions suggest and imply good faith on his part. He did not "release nor authorize for release"[1] the polygraph examination or the letter he had written to the District Attorney. The fact that McIlwain had given his client, Terry, a copy of the letter does not mean he was releasing it for dissemination[2], rather it is just good practice for an attorney to keep his client informed.

¶33. The Court finds that proof presented by the State did not rise to the level of "beyond a reasonable doubt." There was mere suspicion and innuendo on the part of the State and the trial judge. For these reasons, this Court reverses and renders the decision of the lower court because McIlwain's acts or failure to act did not rise to the level of impeding the administration of the court.

**III. THE TRIAL COURT WAS IN ERROR IN FAILING TO ALLOW THE "RULE" TO BE INVOKED.**

¶34. Terry and McIlwain claim that the trial court was in error by failing to invoke the "Rule", meaning Miss. R. Evid. 615. However, neither Terry nor McIlwain identified any prejudice flowing from the court's ruling. This Court has addressed this issue by holding when a violation of the sequestration rule is assigned as error on appeal, the failure of the judge to order a mistrial or to exclude testimony will not justify a reversal on appeal absent a showing of prejudice sufficient to constitute an abuse of discretion. *Gerrard v. State*, 619 So. 2d 212, 217 (Miss. 1993). Because there has been no prejudice identified by the appellants in the court's failure to invoke the "Rule", we find this assignment of error without merit.

### IV. THE TRIAL COURT WAS IN ERROR IN HEARING THIS MATTER ITSELF IN LIGHT OF THE FACT THAT IT SHOULD HAVE BEEN REFERRED TO ANOTHER JUDGE.

¶35. As stated earlier in the facts of this opinion, Judge Bogen issued the summons for Terry, McIlwain, and Evans, for supposed actions that took place outside of his presence and outside of his courtroom. The supposed actions took place prior to the June 1, 1994, hearing on contempt. Therefore, this cause was certainly constructive contempt.

¶36. Terry and McIlwain argue on appeal that because Judge Bogen was monumental in the contempt charges being brought against them, he should not have been the judge to hear the proceedings. The appellants state that Judge Bogen committed reversible error by not recusing himself and letting another judge preside over this matter. We agree.

¶37. This Court has held that direct contempt may be handled by the sitting judge instantly. *Purvis*, 657 So. 2d at 798. Judge Bogen waited until June 1, 1994, to bring the contempt proceedings against Terry and McIlwain. The actions that gave rise to the contempt charge occurred earlier than the publication of the advertisement in the newspaper, but at the very latest, when the newspaper was published on May 22, May 23, and May 24, 1994. Further, Judge Bogen made his decision based on acts that took place outside of his presence. It is necessary for the individual to be tried by another judge in cases of constructive contempt where the trial judge has substantial personal involvement in the prosecution. *Id.*; (*citing Varvaris v. State*, 512 So. 2d 886, 888 (Miss. 1987). *In re Murchison*, 349 U.S. 133 (1955), was a case where a judge acted under state law as a one-man grand jury and later tried witnesses for contempt who refused to answer questions propounded by the "judge-grand jury." The United States Supreme Court held that since the judge who sat as a one-man grand jury was part of the **accusatory process he "cannot be, in the very nature of things, wholly disinterested in the conviction or acquittal of those accused." *Id.*, at 137** (emphasis added). "Fair trials are too important a part of our free society to let prosecuting judges be trial judges of the charges they prefer." *Id*.

¶38. Because Judge Bogen was instrumental in the initiation of the constructive contempt proceedings, this Court holds that he should not have heard the contempt proceedings. He should have turned over those proceedings to another judge. There can be no arguments by the State that the charges had to be heard immediately because (1) Judge Bogen did not hear the charges until June 1, 1994; and (2) the underlying trial on the merits of Terry's embezzlement trial had been continued "until a future date."

**ASSIGNMENTS OF ERROR**

**of Traci Evans**

**I. THE TRIAL COURT ERRED IN HEARING THIS MATTER ITSELF, IN LIGHT OF THE FACT THAT IT WAS A CONSTRUCTIVE CRIMINAL CONTEMPT CHARGE AND HEARING, AND SHOULD HAVE BEEN REFERRED TO ANOTHER JUDGE.**

**III. THE TRIAL COURT COMMITTED REVERSIBLE ERROR DUE TO THE STATE'S FAILURE TO SUFFICIENTLY PROVE THE ELEMENTS OF CONSTRUCTIVE CRIMINAL CONTEMPT AND THAT THE APPELLANT WAS GUILTY BEYOND A REASONABLE DOUBT.**

¶39. This Court holds that Traci Evans was improperly charged with contempt as she did not fall under the authority of Uniform Circuit and County Court Rule 9.01. As such, Evans cannot be guilty of a violation and the points of error raised above are moot.

¶40. Rule 9.01 concerning pretrial publicity reads in relevant part:

> Prior to conclusion of the trial, no **defense attorney, prosecuting attorney, clerk, deputy clerk, law enforcement official or other officer of the court,** may release or authorize release of any statement for dissemination by any means of public communication on any matter. . . .

URCCC 9.01(emphasis added).

¶41. Evans did not fall under the class of people designated in Rule 9.01 because she had no connection with the proceedings save her friendship with the defendant. In the present case, the trial court erroneously charged Evans with contempt because she was not involved in any aspect of the matter before the court.

### III. THE TRIAL COURT WAS IN ERROR IN A CONSTRUCTIVE CONTEMPT HEARING BY VIOLATING APPELLANT'S RIGHT TO COUNSEL.

¶42. Although this issue is also rendered moot by the application of Rule 9.01, it merits discussion in order to provide future instruction to the trial courts.

¶43. At the beginning of the contempt proceeding, Judge Bogen inquired as to whether Terry and McIlwain were represented by counsel. McIlwain responded that both were represented by Kilpatrick. Judge Bogen then inquired as to whether Traci Evans was represented by counsel.

> THE COURT: Is your name Traci Evans?

> MS. EVANS: Yes, sir, it is.

> THE COURT: Do you have a lawyer?

> MS. EVANS: No, I do not.

THE COURT: All right. State ready to proceed?

¶44. Judge Bogen proceeded with the contempt proceedings with full knowledge that Evans did not have an attorney and that the possible sentence to be imposed would be incarceration in the county jail. This was a blatant disregard for Evans' Sixth Amendment right to counsel, which has been enumerated to the States by way of the Fourteenth Amendment. *Argersinger v. Hamlin*, 407 U.S. 25, 27 (1972).

¶45. The State erroneously responds to Evans' assignment of error by misreading her argument and *Argersinger* to address the government's duty to provide counsel to an indigent defendant. Id. at 26-37. Evans is not contending on appeal she should have had counsel appointed for her. Judge Bogen at no time advised her that she had a legal right to seek the advice and be represented by legal counsel, or that her punishment might include incarceration.

¶46. In *Powell v. Alabama*, 287 U.S. 45, 68-69 (1932), the United States Supreme Court said:

> The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. **Even the intelligent and educated layman has small and sometimes no skill in the science of law**. If charged with crime, he is incapable generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. **If that be true of men of intelligence**, how much more true is it of the ignorant and illiterate, or those of feeble intellect.

(emphasis added).

¶47. Here the Court spoke in terms of all persons having a right to counsel, those who were educated and intelligent, as well as those who were ignorant and illiterate. Nothing is mentioned about the "right to counsel" being conditioned on economic status as the State argues. Again, Evans does not argue that she should have had counsel provided for her, but that she be informed of the charges and of her right to consult with an attorney.

¶48. The holding and rationale in *Powell* has relevance to any criminal trial, where an accused is deprived of her liberty. *Argersinger*, 407 U.S. at 32. One charged with an offense against the criminal laws of a state has a right to effective assistance of counsel in making his or her defense as secured by the Sixth and Fourteenth Amendments to the Constitution of the United States. *Read v. State*, 430 So. 2d 832, 837 (Miss. 1983) (*citing Gideon v. Wainwright*, 372 U.S. 335 (1963)). "The right to counsel guaranteed by the Sixth Amendment is a fundamental right." *Vielee v. State*, 653 So. 2d 920, 922 (Miss. 1995) (*citing Argersinger*, 407 U.S. at 25.

¶49. Fundamental rights are guaranteed to all persons, without regard of race, color, creed, religion or socio/economic status because of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States. The State responds by claiming the court's statement, "Do you

have a lawyer?" should have been taken by any reasonably intelligent person to mean that she was entitled to counsel if she desired representation. This argument is without merit and shows a blatant disregard for the United States Constitution and over 60 years of interpretations of that sacred document by the United States Supreme Court and this Court. To say that a reasonably intelligent person would know they needed a lawyer goes completely against the decision of the United States Supreme Court. *Powell*, 287 U.S. at 68-69.

¶50. Judge Bogen should have informed Evans of her right to seek the advice of an attorney before proceeding with the contempt proceeding. The right to effective assistance of counsel, like any other constitutional right, may be waived. *Read*, 430 So. 2d at 838 (*citing Matthews v. State*, 394 So. 2d 304, 309 (Miss. 1981)). "But before there can be a waiver, the defendant must be given a meaningful and realistic opportunity to assert the right." *Id.* "If he is given that opportunity and he intelligently and voluntarily declines to assert the right, it is then waived. *Id.* The record is void of any explanation by the trial judge to Evans as to the ramifications of the charges against her and the possible sentence to be imposed if she were found guilty of the constructive contempt charges. Therefore, Evans was deprived of her opportunity to assert her right to counsel and could not make an intelligent and voluntary waiver of that right.

¶51. Although this issue is moot, the right to counsel is a fundamental right. The trial courts should exercise due diligence to ensure that all parties are informed of this right before a proceeding continues.

## CONCLUSION

¶52. The contempt proceedings against Terry, McIlwain, and Evans should not have been heard by Judge Bogen because he was instrumental in bringing the constructive contempt charges against the three, and because of the discussion of his need to recuse himself. The failure of Judge Bogen to "invoke the rule" was not reversible error because the appellants did not show how they were prejudiced by his failing to do so. Evans was improperly charged with contempt because she did not fall under the contempt power of the court as a detached third party. Additionally, Evans was denied her right to counsel because Judge Bogen proceeded without informing her of her right to seek the advice of an attorney and the ramifications if she did not seek one.

¶53. **REVERSED AND RENDERED AS TO ALL APPELLANTS.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, McRAE, SMITH, MILLS AND WALLER, JJ., CONCUR.**

1. McIlwain was being held in contempt for violation of Rule 4.01 of the Uniform Criminal Rules of Circuit Court Practice, which provides:

> The defense counsel, prosecuting attorneys, law enforcement officials, clerks, deputy clerks, and other officers of the court, **shall not release nor authorize release** of **any statement for dissemination** by any means of public communication any matter concerning:

***

(3) The **performance on any examinations** or tests, or the defendant's refusal or failure to submit to an examination or test;

***

(6) The **defendant's** guilt or **innocence**, or other matters relating to the merits of the case, or the evidence in the case.

(emphasis added).

2. See the above footnote; McIlwain was not disseminating the letter by a means of public release by giving a copy to his client. Evans testified that she took the letter without Terry's knowledge.